Fecteau, J.
This is an action under the provisions of G.L.c. 231A by which the plaintiffs seek a judgment which declares their rights, under principles of cy pres, to require a transfer from the defendants of two charitable trust funds, known as the Stone Camp Fund and the Gates Fund. The defendants, with the exception of the Attorney General, deny that the plaintiffs have standing, and, if they do, that the operation of cy pres does not require any transfer of control from them.
The case came on for trial before me sitting without a jury on July 21-23, 1998. Upon consideration of the credible evidence and the stipulations of the parties, I make the following findings of fact and rulings of law.
FINDINGS OF FACT A. THE PARTIES
1. The plaintiff Boy Scouts of America (herein “BSA”) is a corporation chartered by the Congress of the United States in 1916. The Nashua Valley Council, Boy Scouts of America, Inc. (herein “Nashua”), the other plaintiff, is a subdivision of the BSA which services the northern, central Massachusetts area, and was formed in 1965.
2. The defendant Monadnock Trust, Inc. (herein “Monadnock Council”), is a corporate successor to the Monadnock Council, Boy Scouts of America, Inc., first formed in 1930 and chartered under the auspices of the Boy Scouts of America. The defendant trustees (herein “Trust”), are successor trustees to the original who were appointed in the Declaration of Trust signed and recorded in 1929. Albert H. Stone was both an original trustee of the Monadnock Trust and an incorporator and the first president of the Monadnock Council.
3. The purposes of the Boy Scouts of America, as expressed in the charter granted it in 1915 by the Congress of the United States, are as follows:
That the purpose of this organization shall be to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scout- *69 craft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts.
[Ex. 1, p. 3, sec. 3.) In addition, the by-laws state, as of 1989, that “[i]n achieving this purpose, emphasis shall be placed upon its educational program and the oaths, promises, and codes of the Scouting program for character development, citizenship training, mental and physical fitness.” [Ex. 1, p. 6, sec. 2.]
4. In the by-laws of the Monadnock Council which I infer were in effect from its formation and during the time in which the charitable gifts in question were made, the purposes of the Boy Scouts of America were restated. In addition, it stated: “Its [Monadnock’s] activities shall be conducted solely under and by virtue of a charter issued to it from year to year by the National Council of the Boy Scouts of America, and in full accord with the provisions of the Act of Congress . . . approved June 15th, 1916, and the Constitution and By-Laws adopted under the authority thereof.” [Ex. 16, Art. II.] Furthermore, in Article XI of these By-Laws, it allowed, in the event of the dissolution of the council or the revocation of its charter, that any real estate acquired by the corporation be conveyed to the Boy Scouts of America or sold and the proceeds paid “for the benefit of Scouting.”
5. The Monadnock Council failed to obtain a renewal of its charter and by January 1, 1993, it ceased to be affiliated with the Boy Scouts of America. The National Council ordered a consolidation of the districts formerly serviced by the Monadnock and Nashua Councils and, thereafter, the consolidated district would be serviced by Nashua only. Moreover, it ordered that Monadnock turn over the control of the charitable trust funds known as the Stone Fund and the Gates Fund to the Nashua Council. The Monadnock Trust, Inc., as corporate successor to the Monadnock Council has refused to do so.
B. THE STONE FUND
6. In 1945, the late Albert H. Stone wrote to the Monadnock Council and expressed his intention to make a gift. In this letter, he wrote, in pertinent part, as follows:
... I have been associated with and intensely interested in your organization for many years. I was one of the original incorporators of the Council at the time of its formation April 26, 1930. During this period I have given much time and effort and have made some contributions to it because I believe in its aims and purposes. It is doing a wonderful work for the boys of our community and surrounding towns. I have decided to make a substantial contribution to Monadnock Council, . . . such contribution, if accepted subject to the conditions hereinafter set forth, to be placed in a special fund to be designated as the Albert H. Stone Camp Fund and to be used for the general upkeep, improvement and development of Camp Collier without any limitation.
I offer to give to Monadnock Council, Inc., Boy Scouts of America, of Gardner, Massachusetts, certain securities,... This gift of securities, if accepted by Monadnock Council... is subject to the following conditions: [the conditions relate to the appointment of a three-member committee that was to make recommendations as to expenditures and changes in the fund investments and provided for the qualifications and succession of its members, including that each be a “member of the Council"].
[Ex. 7.]
7. Camp Collier existed at that time as a result of gifts and acquisitions which enabled the trust to acquire real estate for purposes of camping. The trust, formed in 1929, acquired its first parcel by “deed of even date” with the declaration of trust. Albert H. Stone was one of the first three trustees of the trust and, by implication, would have known of the contents of the declaration. The declaration set out the following purposes and conditions:
1. For the use and benefit of the Monadnock Council, Boy Scouts of America, a voluntary association, or any corporation or corporate body succeeding it and for such uses, purposes and benefits as are customarily enjoyed by Boy Scout troops as organized, promoted and conducted by the Boy Scouts of America, . . .
2. In the event of the dissolution of said Monadnock Council, Boy Scouts of America, or the revocation, suspension, or lapse of its charter by the National Council of the Boy Scouts of America, or the revocation, suspension or dissolution of any corporation chartered to succeed the Monadnock Council, Boy Scouts of America, or of its failure to promote or provide boy scout activities in the City of Gardner or other towns incorporated in said Monadnock Council, Boy Scouts of America, for the period of one year, or shall fail to pay all expenses, . . . then and in that event to convey the said property in their uncontrolled discretion, to some other charitable association, or organization or corporation in the City of Gardner, Massachusetts, to be used by such charitable association, etc., for some charitable purpose for the general benefit of the citizens of said Gardner; or, in their uncontrolled discretion, to sell said property, discharged of all trusts, ... to transfer, set over and deliver the proceeds in trust, or otherwise to some charitable association, etc., in the City of Gardner, Massachusetts, to be by it or them used for some charitable purpose for the general benefit of the citizens of said Gardner . . .
Ex. 5.]
8. Notwithstanding the knowledge that I infer Albert H. Stone had of the possibility that Camp Collier might someday be donated to some other charity, or sold and *70 the proceeds be donated to some other charity, his gift to the council “for the general upkeep, improvement and development of Camp Collier” did not specify the actions it should take in the event the camp were to cease operations as he then was aware, which was principally, if not exclusively, as a boy scout camp. Had he intended that this gift follow the course of the camp, he could have donated it to the trust. I infer from the fact that he did not donate it to the trust, but rather to the council, shows that his intent was to benefit local scouting, which emphasizes outdoor activities as a vehicle for the teaching of the more intangible lessons and benefits of scouting, believing as he did in the “aims and purposes” of the council, obviously favoring a specific campground known to him at that time with which he had close ties. I also infer that since he did not donate this fund to the trust, he intended to benefit scouting in the Monadnock district, which comprised the City of Gardner and several nearby towns. Had he donated it to the trust, and if his intent was for it to follow the course of the camp, in the event of the council’s loss of charter, for example, the camp or the proceeds from its sale would have been limited to “the general benefit of the citizens of Gardner,” only.
9. I find that the donor’s intent was to benefit the outdoor scouting program of the Monadnock district and not specifically to benefit Camp Collier to the exclusion of all other possibilities; of course, for as long as it was possible to reconcile those two purposes, they were, up to and including December 31, 1992. However, after that date, it became impossible for the defendant Monadnock Trust, Inc., the successor to the Monadnock Council, to engage in the scouting movement as it was prohibited from engaging in any “scouting” activities. Thus, it is impossible or at least impracticable for the Monadnock Trust; tnc. to carry out the “aims and purposes” of its original charter under the Boy Scouts of America; additionally, the camp fund committee must be “members of the council.” Since the Monadnock Council had ceased to exist, the members of the camp fund committee must come from another source, but not necessarily from another region. This is further confirmation of the donor’s general intent to benefit local scouting as opposed to specifically benefiting the camp; if the trust was forced under its declaration to divest itself of the camp and donate either it or sale proceeds to benefit citizens of the City of Gardner, the Stone Camp Fund was to survive. This, of course, is not to say that the fund may be used, even by Nashua, for purposes beyond that contemplated by Mr. Stone.
C. THE GATES FUND
10. On September 7, 1984, Mildred Gates signed her Last Will and Testament, in which she bequeathed, in Clause “FOURTEENTH: . . . [subparagraph] (I), the following;
FIVE (5%) PERCENT THEREOF to the MONAD-NOCK COUNCIL, INC., BOY SCOUTS OF AMERICA, OF GARDNER, MASSACHUSETTS. This bequest is upon the condition that the principal of this bequest shall never be expended but shall be invested by the duly authorized officials of the COUNCIL, or their appointees for such purpose, with the income therefrom only to be used for the carrying on of the activities, including repairs and maintenance, of the COUNCIL as the duly authorized officials of the COUNCIL may from time to time determine.
This fund shall be known as the HAROLD AND MILDRED GATES MEMORIAL FUND. [Upper case in original.]
[Ex. 8.]
11. Mildred Gates died in 1988, followed in 1989 by the allowance of her estate and the distribution of the above bequest, among others.
12. The donor intended that her gift benefit the activities of the Monadnock Council, then chartered under the Boy Scouts of America. The Monadnock Trust, Inc., successor to the Monadnock Council, cannot, by definition and by express prohibition, conduct the same or even substantially similar activities as its predecessor had under its charter with the Boy Scouts of America. She did not intend to have her gift follow the succession of the Council if it were to lose its charter, which it did. I infer that she had a general intent to benefit scouting activities in the region once serviced by the Monadnock Council.
RULINGS OF LAW
1. Ability of Plaintiffs to Maintain Cy Pres Action
The defendants argue that the plaintiffs lack standing to pursue this action, contending that the Attorney General’s office has the exclusive right to oversee the operation of charitable organizations.
It is the duty of the Attorney General to take action to protect public charitable trusts and to enforce the proper application of their funds given or appropriated to public charities within Massachusetts and to prevent breaches of trust in their administration as he represents the public interest. Lombard, Probate Law and Prac., Vol. 22, §1447. In Weaver v. Wood, 425 Mass. 270 (1997), two church members sought to challenge the decision of church directors to authorize investments in television ventures. Id. at 271. The plaintiff claimed that the defendants failed to abide by a trust deed executed to promote the religious organization. Id. Upon the defendants’ argument that the plaintiffs lacked standing, the trial judge ruled that the plaintiffs did have standing as “members of the Mother Church in a special and unique manner separate and distinct from any member of the public.” Id. On appeal, the Supreme Judicial Court vacated the lower court’s ruling, stating “when a trust is charita *71 ble, and is created not to benefit one or more individuals but is devoted to purposes that are beneficial to a broader community, the Legislature has determined that the Attorney General is responsible for ensuring that its charitable funds are used in accordance with the donor’s wishes.” Id. at 275. The court noted that it has consistently held that only the Attorney General can bring an action alleging the misuse of charitable assets. Id. The court, however, did recognize a narrow exception where the claim arises from a personal right that directly affects the individual members. Id. at 276.
The narrow exception to the general rule that the attorney general initiate a claim alleging misuse of charitable assets noted by the court in Weaver, supra, was fully addressed by the court in Lopez v. Medford Community Center, Inc. 384 Mass. 163 (1981). In Lopez members and officers of a community center brought an action to prevent the defendants, all of whom were acting as directors and officers of the corporation, from taking action to interfere with the plaintiffs’ membership rights. Id. at 164. The community center is a charitable corporation organized for civil and educational purposes. Id. Upon the defendants’ contention that the plaintiffs lacked standing, the court ruled that the plaintiff did have standing for the limited purpose of litigating their claim that they were unlawfully denied membership in the community center. Id. at 168. The court noted that “it is the exclusive function of the Attorney General to correct abuses in the administration of a public charity." Id. at 167 (citations omitted). The court explained that this was the rule at common law and is presently codified by G.L.c. 12, §8. Id. However, the court noted that notwithstanding the Attorney General’s exclusive and discretionary role as a protector of the public interest in the efficient and lawful operation of charitable corporations, a private plaintiff possesses standing to assert interests in such organizations which are distinct from those of the general public. Id.
Thus, the court distinguishes between mismanagement of a public charity and the assertion of individual rights curtailed by a charitable organization. In the former, it is within the realm of the Attorney General’s exclusive authority to commence an action to correct abuses of administration. Lopez v. Medford Community Center, Inc., supra, 384 Mass. at 164. The central issue to be resolved in the present matter involves a determination of the intended beneficiaries of two charitable trusts and the appropriate vehicle for carrying out the donative intent. However, since the plaintiffs allege to be the only duly authorized entity able to carry out the donors’ intent, and have, in a representative capacity already benefited from the trusts’ directives in the past, they may sustain an action on the basis that they have an interest in the funds, special and distinct from the public interest. Lopez, supra at 167.
II. Application of Cy Pres Doctrine
In applying the doctrine of cypres, the court endeavors to accomplish the general charitable intent of the testator “as near as it can be conveniently done, consistent with the efficacious promotion of the general design.” Brookline v. Barnes, 327 Mass. 201, 208 (1951).This does not involve a deviation from the intention of the donor as to the charitable purpose but instead changes the direction as to the management of the gift. Lombard, Probate Law and Practice, Vol. 22, §1447 (1962).
Trust instruments are to be interpreted by consideration of their language in light of the circumstances attendant upon its drafting and delivery. Hillman v. Roman Catholic Bishop of Fall River, 24 Mass.App.Ct. 241, 243 (1987) (citations omitted). In order to determine the character of the testator’s charitable intent, courts must look to the language as a whole and to circumstances relevant to the property involved in the trust. First Church in Sommerville v. Attorney General, 375 Mass. 332, 336 (1978).
A gift with a general charitable intent imposes a trust in which the grantee may not use the assets for private, personal purposes. Hillman v. Roman Catholic Bishop of Fall River, 24 Mass.App.Ct. 241, 242-43, n. 3 (1987). In such instances, the assets must be used for charitable purposes consistent with those of the designated charity. Id., see Attorney General v. Hahnemann Hospital 397 Mass. 820, 836 (1986) (rejecting position that charitable corporation may apply unrestricted funds to any charitable purpose which by amendment adds to article of organization). However, it is not beyond the scope of the cy pres doctrine that, although members of the defined or specific class must be given preference in devising a scheme to dispose of the property, members of the general class described may also receive the benefits of the trust. Rogers v. Attorney General 347 Mass. 126, 134 (1964) (citations omitted).
A controversy exists between the parties as to the proper beneficiaries of the Stone and Gate Funds and which of two entities is entitled to administer the funds. To effectively determine the proper beneficiaries of the bequests which, in turn, may be determinative of the management, it is necessary to examine the language of the documents as well as the circumstances surrounding each bequest. First Church in Sommerville v. Attorney General, supra, 375 Mass. at 336.
a. The Stone Fund
In a December 1945 letter addressed to the Monadnock Council, Stone stated in pertinent part, “I have made contributions to it [Monadnock Council] because I believe in its aims and purposes. It is doing a wonderful work for the boys of our community and surrounding towns.” At the time of this gift, the Monadnock Council was operating for the sole purpose of promoting the “ability of boys to do things for themselves and others ...” The Council was established for this specific purpose, to serve the boy scouts *72 in the Gardner area. The original articles of organization of the Council were replete with reference to the boy scouts. Stone was also intimately associated with the aims and purposes in his capacity as a founder and corporate member of the Council and trustee of the Camp Trust.
In Sleeper v. Camp Manotony, 352 Mass. 47 (1967), the court was confronted with a factual situation closely resembling the present matter. In Sleeper, the testator bequested legacies to “Arlington Girl Scouts of Arlington, Massachusetts.” Id. at 47. However, between the time of the execution of the will and her death, the national girl scout organization revoked its charter and issued a scouting charter to a new Massachusetts corporation. Id. at 48-49. The court ruled that the proper beneficiary of the bequest was the successor of the Arlington Girl Scouts. Id. at 50. The court reasoned that the designation of the corporation was not the essence of the gift, it was merely the instrument to carry out the charitable purpose of the testatrix. Id,, citing Hubbard v. Worcester Art Museum, 194 Mass. 280, 289-90 (1907) (holding property given to art museum as corporation not apart from charitable work in which it is engaged); see also Anna Jaques Hospital v. Attorney General, 341 Mass. 179, 182 (1960) (holding charitable gift does not fail because corporation receiving bequest which had dissolved was not the essence of the gift).
Briggs v. Merchants National Bank, 323 Mass. 261 (1948), also emphasized the preference given to the goal rather than the instrumentality chosen to carry out the goal. The court noted that in applying the cy pres doctrine, it will presume that the donor would attach much more significance to the object of the gift than to the mechanism by which he intended to accomplish it. Id., at 274. The court further reasoned that the donor would have preferred to alter the mechanism to the extent necessary to save the object of the gift. Id., at 275.
In the present matter, Stone was unambiguously clear that he wished to benefit the boy scouts in the Gardner area. He was a dedicated officer of the Monadnock Council in its capacity as the provider of scouting in Gardner and surrounding towns. Although the bequest commands that the funds be used for the upkeep and development of Camp Collier, the funds were intended to benefit the scouting activities conducted at the camp. Had Stone intended to benefit the camp, he could have easily donated the funds to a trust in existence for the benefit of the camp. The court is also satisfied that the Stone Fund was intended by Stone to benefit boy scouting in the Monadnock geographic area, not the Monadnock Council personally. Briggs, supra, 323 Mass. at 274. Although the Monadnock Council has ceased operations under the Boy Scouts of America, scouting still continues in the Gardner area under the direction of the Nashua Valley Council Boy Scouts of America. Accordingly, Nashua is the proper recipient of the Stone Fund. Naming Nashua as the proper recipient will enable Stone’s intentions to be satisfied and ensure that the funds are not diverted to non-scouting activities, and judgment hereunder shall limit the scope of the fund to the geographic area once serviced by the Monadnock Council. See Sleeper v. Camp Manotony, Inc., supra, at p. 51.
b. The Gates Fund
The other gift at issue in this matter was a donation by Mildred Gates. In her last will and testament, Gates bequest, “. . . to the Monadnock Council, Inc., Boy Scouts of America, of Gardner, MA . . . with the income therefrom only to be used for the canying on of the activities, including repairs and maintenance, of the Council.” An examination of the language of the bequest as well as the circumstances surrounding the bequest reveals a particular allegiance to scouting. First Church in Sommerville, supra, 375 Mass. at 336. I am satisfied that Gates, as did Stone, intended the Council to serve as the vehicle to accomplish her intentions, not to benefit as the recipient in its personal capacity. Sleeper v. Camp Manotony, supra, 352 Mass. at 50.
Examining the testator’s last will and testament as a whole, it is clear that Gates intended to benefit the boy scout programs in the Gardner area. Gates specified that the funds shall be used for “carrying on the activities of the Council.” At the time of the bequest, the sole purpose of the Council was to provide scouting activities in the Gardner area. The successor Monadnock Trust, Inc., corporation to the Monadnock Council cannot engage in substantially similar activities of its predecessor. Brookline v. Barnes, supra, 327 Mass. at 208. Applying the doctrine of cy pres, Monadnock Trust, Inc., therefore, is not the proper recipient of the funds because its aims and purposes are not consistent with the designated bequest. Hillman v. Roman Catholic Bishop of Fall River, supra, 24 Mass.App.Ct. At 242-243. Nashua, however, does engage in promoting and providing scouting activities in the Gardner area. Accordingly, Nashua is the proper recipient of the Gates fund. Under Nashua’s management, the Gates Fund will be distributed consistently with Gate’s intent: to benefit scouting activities in the geographic area once served by the Monadnock Council.
ORDER FOR JUDGMENT
Due to the issues joined by the pleadings, judgment shall issue which declares the management and control of the Stone and Gates funds be transferred to the plaintiff Nashua Valley Council, Boy Scouts of America. However, due to the nature of the gifts, further consideration should be given to the management of these funds, so that the donative intent can be complied with as closely as possible, especially in regards to the membership of the committees assigned to administer the funds and the limitations on their use, geographic and otherwise, deemed necessary.
Therefore, the parties are to submit proposed forms of judgment to the Court by August 28, 1998.